**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SOLMATE INFRASTRUCTURE PLC,

Plaintiff,

v.

RBCH LTD., VIKTOR FISCHER, and JAKUB HAVRLANT,

Defendants.

Case No. ________________

**COMPLAINT**

Plaintiff Solmate Infrastructure PLC, formerly known as Brera Holdings PLC ("Solmate" or the "Company"), by its undersigned counsel, bring this action against Defendants RBCH Ltd. ("RBCH"), Viktor Fischer ("Fischer"), and Jakub Havrlant ("Havrlant" and, together with RBCH and Fischer, "Defendants" or the "RBCH Group") for violation of federal securities laws.

## <u>INTRODUCTION</u>

1. This is an action for declaratory and injunctive relief under Section 13(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(d). Defendants RBCH, Fischer, and Havrlant hold approximately 18.33% of the common stock of issuer Solmate in both ordinary shares and warrants. When Solmate's Board adopted a shareholder rights plan on April 24, 2026 (the "Rights Agreement") in accordance with its articles of association, Defendants' position was grandfathered: if Defendants acquired so much as a single additional share, they would lose that

status, become an "Acquiring Person," and their holdings would be exposed to substantial dilution. As a result, Defendants found a different way to command a larger voting bloc. After the Rights Agreement was adopted, they agreed with BREA Holdings, LLC ("BREA"), Pinehurst Partners LLC ("Pinehurst"), Boustead & Company Ltd. ("BCL"), Boustead Securities, LLC ("BSL"), Daniel J. McClory, Keith C. Moore, Lincoln J. Smith, and Alberto Libanori (collectively, the "McClory Group") to act together to seize control of the Solmate Board. The agreement made Defendants and the McClory Group a new "group" under the Exchange Act (the "Aggregate Group") with combined beneficial ownership of 24.17%. Defendants have never disclosed this arrangement. Instead, their Schedule 13D reports only their own 18.33% and denies the existence of any arrangement with anyone else. This action seeks to compel Defendants to comply with their disclosure requirements under Section 13(d) of the Securities and Exchange Act.

2. Solmate[1] is an institutional infrastructure company that supports Solana, a blockchain platform for digital currency. Solmate builds institutional-grade Solana staking, validation, and treasury infrastructure. Solmate's Class B common stock shares publicly trade on NASDAQ.

3. Solmate's Rights Agreement was adopted to guard against hostile takeover attempts. It defines "Acquiring Person" as any person who, together with its affiliates and associates, beneficially owns more than 9.99% of the Company's outstanding common stock. The Rights Agreement incorporates the Section 13(d) concept of beneficial ownership, expressly including shares held by any person with whom the holder has an agreement, arrangement, or understanding for the purpose of acquiring, holding, voting, or disposing of securities.

---

[1] This Complaint refers to Plaintiff as Solmate at all times, even though some events occurred before the Company changed its name and was then called Brera Holdings PLC.

4. Because Defendants already beneficially owned 18.33% of ordinary shares and warrants on the adoption date, the Rights Agreement exempted their position from dilution so long as it did not grow. Under the Rights Agreement's terms, however, Defendants' position grows not only when they acquire shares, but when they agree to act in concert with other holders—because at that moment they become the beneficial owner of those holders' shares as well.

5. This is what occurred. As detailed below, after April 24, 2026, Defendants coordinated with the McClory Group, each of whom held a significant position in Solmate. No later than May 2026, Defendants and the McClory Group agreed to act together to remove the existing Solmate Board and install new directors, including Fischer. In furtherance of that agreement, the McClory Group publicly endorsed Defendants' nominees in coordinated statements, voted alongside Defendants to remove and replace the Board, and participated in Defendants' communications with other stockholders. Solmate's counsel directly asked the McClory Group to deny being involved in such an arrangement and the McClory Group would not do so. No member of the Aggregate Group has purchased a share since the agreement was formed. None needed to: the Aggregate Group already held approximately 24.17%.

6. Section 13 of the Securities Exchange Act of 1934 (the "Exchange Act") provides that any investor who directly or indirectly acquires beneficial ownership of more than 5% of a class of registered securities must file a Schedule 13D with the U.S. Securities and Exchange Commission. Under Section 13(d)(3) of the Exchange Act and Rule 13d-5(b)(1), investors who work in a group to acquire such beneficial ownership are required to disclose that arrangement.

7. The disclosure regime contained in Section 13(d) of the Exchange Act is intended to inform shareholders and the market when persons or groups have accumulated significant ownership and may seek to influence or control a public company.

8. The associated regulations hold reporting persons responsible "for the completeness and accuracy of the information concerning such person contained therein." 17 C.F.R. § 240.13d-1(k)(1)(ii). Defendants' filings are neither complete nor accurate.

9. Defendants, who together beneficially own more than 10% of Solmate's Class B Ordinary shares, are required to file a Schedule 13D. Defendants' Schedule 13D filings, the most recent of which was filed on October 26, 2026, omit that they have made an undisclosed arrangement with another group of Solmate shareholders to obtain control over Solmate.

10. The arrangement was itself an acquisition that Section 13(d) regulates. In *GAF Corp. v. Milstein*, 453 F.2d 709, 716 (2d Cir. 1971), the Second Circuit confronted precisely this situation—four holders who had received their shares years earlier and then agreed to coordinate their activities to pursue control—and held that "the group when formed acquired a beneficial interest in the individual holdings of its members." 453 F.2d at 716. The court rejected the argument that a group must also purchase shares before the filing obligation attaches: "A shift in the *loci* of corporate power and influence is hardly dependent on an actual transfer of legal title to shares," and "[i]t hardly can be questioned that a group holding sufficient shares can effect a takeover without purchasing a single additional share of stock." *Id.* at 718.

11. The same agreement that triggered Section 13(d) also, under the Rights Agreement's incorporation of Section 13(d) beneficial ownership, terminated Defendants' grandfathered status and made them an Acquiring Person.[2] Defendants knew that an accurate Schedule 13D disclosing the group would reveal exactly that. The only way to wield the voting power of a 24.17% bloc while preserving the protection the plan afforded a grandfathered holder

[2] Solmate does not seek in this action a determination of the consequences of these events under the Rights Agreement, and it expressly reserves all of its rights and remedies under the Rights Agreement and applicable law.

was to fail to disclose the voting bloc to Solmate and the market. That is the reason for Defendants' false filing.

12. Defendants' failure to disclose the Aggregate Group to the Company, its shareholders, and the market at large, despite their legally mandated disclosure requirements, deprived each of critical information about the full extent of the Aggregate Group, including its intentions, its size, and the volume of its holdings.

13. To force Defendants to comply with their legal requirements, Solmate seeks both a declaration that Defendants and the McClory Group constitute a group under Section 13(d)(3) and injunctive relief requiring the Aggregate Group to (i) file an amended Schedule 13D, properly disclosing the existence, purpose, and collective holdings of the Aggregate Group, and (ii) abstain from acquiring additional shares pending completion of Defendants' Schedule 13D filings. Solmate does not seek money damages.

## **PARTIES**

23. Plaintiff Solmate Infrastructure PLC is a public limited company incorporated in Ireland. Solmate was formerly known as Brera Holdings PLC. Solmate builds infrastructure on the Solana blockchain and holds digital assets on its balance sheet. Solmate's Class B ordinary shares trade on the Nasdaq Capital Market under the symbol "SLMT."

24. Defendant RBCH is a Cayman Islands company limited by shares. RBCH's sole shareholder is Rockaway Blockchain Fund I, L.P. ("Fund I"). Fund I's general partner, Rockaway Blockchain GP Ltd., is wholly owned by RockawayX a.s., a Czech business entity ("RockawayX"), which in turn has two 50% shareholders: OxVIFI (which is wholly owned by Viktor Fischer) and DOBERMAN Corp. s.r.o. RBCH is classified as a Reporting Person on the Schedule 13D statements at issue, and certified and signed the Schedule 13D filing.

25. Defendant Viktor Fischer is a citizen of the Slovak Republic whose principal business address is in Dubai, United Arab Emirates. Fischer is the founder and Chief Executive Officer of RockawayX. Fischer and Havrlant indirectly hold 100% of the outstanding equity of the general partner of Fund I, which has the power to remove and replace RBCH's directors. Fischer is a Reporting Person on the Schedule 13D statements at issue, and he certified and signed the Schedule 13D filing.

26. Defendant Jakub Havrlant is a citizen of the Czech Republic whose principal business address is in Prague, Czech Republic. Havrlant is the founder and Chief Executive Officer of Rockaway Capital and, alongside Fischer, indirectly controls RBCH as stated above. Havrlant is a Reporting Person on the Schedule 13D statements at issue, and he certified and signed the Schedule 13D filing.

27. RBCH, Fischer, and Havrlant are referred to collectively as the "RBCH Group" or "Defendants."

28. The relevant non-parties to this suit are BREA Holdings ("BREA"); Pinehurst Partners; Boustead & Company, Ltd. ("BCL"); Boustead Securities, LLC ("BSL"); Daniel J. McClory; Keith C. Moore; Lincoln Smith; and Alberto Libanori (together, the "McClory Group").

## **JURISDICTION AND VENUE**

29. Federal subject matter jurisdiction exists in this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, because the claims asserted herein arise under Section 13(d) of the Exchange Act, 15 U.S.C. § 78m(d), and Rules 13d-1 (17 C.F.R. § 240.13d-1) and 13d-2 (17 C.F.R. § 240.13d-2).

30. This Court has personal jurisdiction over each Defendant, among other reasons, pursuant to 15 U.S.C. § 78aa, which provides for nationwide service of process, as the claims

asserted against Defendants arise under the Securities Exchange Act of 1934 and each have sufficient contacts with the United States for purposes of appropriate service of process pursuant thereto. Each Defendant is a Reporting Person on the discussed Schedule 13D statements, which were filed with the U.S. Securities and Exchange Commission and concern securities listed on NASDAQ. Defendants assigned counsel in New York to receive notices and communications in connection with those filings.

31. Venue is proper in the Southern District of New York pursuant to 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Various acts or transactions constituting the offenses herein occurred within the Southern District of New York, namely Defendants' false and misleading Schedule 13D disclosures. Defendants, directly and/or indirectly, used the means and instrumentalities of interstate commerce, the United States mails, and the facilities of the national securities markets in connection with the acts, conduct, and other wrongs complained of herein. Further, Defendants are subject to personal jurisdiction in this district for claims under the Securities Exchange Act. Each Defendant is a non-resident of the United States and may be sued in any judicial district.

## FACTUAL BACKGROUND

### A. Defendants Begin Their Quest to Control Solmate.

32. Solmate was registered as an Irish public limited company in 2022, then known as Brera Holdings PLC, an international holding company focused on building a global portfolio of professional football clubs in Eastern Europe, Africa, and other markets. In September 2025, Solmate made the strategic decision to shift its focus from football club ownership to Solana infrastructure and has been winding down its legacy sports business.

33. On September 23, 2025, Solmate closed on approximately $300 million private investment in public equity ("PIPE") financing to rebrand as Solmate and pivot into a Solana-focused digital asset treasury and infrastructure business.

34. As part of the PIPE transaction, RBCH acquired 6,500,000 Class B ordinary shares, common warrants to purchase 11,111,111 Class B ordinary shares, and pre-funded warrants to purchase 4,611,111 Class B ordinary shares, for an aggregate purchase price of $49,999,999.50. Through that acquisition, RBCH became Solana's largest PIPE investor, beneficially owning 9.99% of outstanding Class B Ordinary Shares.

35. Similar to stock options, a stock warrant is a company-issued contract giving a warrant holder the right, but not the obligation, to buy a company's stock at a fixed "strike price" before an expiration date.

36. RBCH, Fischer, and Havrlant jointly filed their initial Schedule 13D concerning Solmate on September 30, 2025, reflecting those ownership amounts.

37. On the same day the PIPE transaction closed, Fischer was appointed to Solmate's Board.

38. Beginning in October 2025, Fischer attempted to sell his company, RockawayX, to Solmate in exchange for more Solmate stock.

39. The history of that failed transaction, which is the subject of a pending action in the Superior Court of the State of Delaware, Brera Holdings PLC v. RockawayX a.s., et al., C.A. No. N26C-05-284 PAW [CCLD] (the "Delaware Action"), is relevant background to Defendants' present campaign and to the reliability of their public disclosures.

40. As alleged in the Delaware Action, Fischer marketed RockawayX as a rapidly growing, highly profitable digital-assets business purportedly generating tens of millions of dollars in revenue.

41. In reliance on Fischer's misrepresentations, on or about December 3, 2025, the parties executed a term sheet for a transaction valued at approximately $200 million. The term sheet contemplated issuing up to 87,155,917 Solmate shares, giving the seller the right to designate two Solmate directors, and appointing Fischer as Executive Chairman of Solmate.

42. Diligence later revealed that the financial results that Fischer presented to Solmate as "actual" were materially overstated, and that the financial profile Fischer used to market the transaction otherwise depended heavily on speculative future revenue streams, unrealized investment valuations, contingent carry economics, aggressive assumptions concerning undeveloped or early-stage business lines, future ungrounded M&As, and management-defined adjustments that materially overstated RockawayX's actual recurring operating profitability.

43. For example, RockawayX's own fund investors were furnished with valuation materials that repeatedly characterized the underlying figures as "unaudited," "illustrative," "indicative," and based on "management estimate[s]," while RockawayX simultaneously presented figures drawn from those same materials to Solmate as "actual" figures in support of a $200 million acquisition valuation.

44. What's more, RockawayX actively tried to conceal the information from Solmate. Solmate specifically requested certain information supporting calculations and underlying data. RockawayX refused, and instead created workbooks for Solmate's review that carried forward prior figures instead of independently deriving actual data from year-end results, which would have shown an operating loss for certain segments and dramatically less revenue overall.

45. Once the truth was revealed, the transaction collapsed, and Solmate publicly announced its termination on February 9, 2026.

46. The Delaware Action, filed on May 29, 2026, asserts claims against RockawayX, RockawayX Holding, and Fischer for fraud, intentional interference with prospective economic relationship, and unjust enrichment.

47. Failing to achieve the RockawayX transaction thwarted Fischer's path to becoming Solmate's Executive Chairman and to having substantial equity and Board influence. Having lost that path to gain influence over Solmate through the transaction, Defendants turned to obtaining it through the shareholder franchise.

48. On March 9, 2026, RBCH gave notice under the terms of its Solmate warrants to increase the beneficial ownership limitation in those warrants from 9.99% to 19.99%, effective May 9, 2026. In connection with that notice, RBCH exercised pre-funded warrants for 1,878,988 Class B ordinary shares, which the Company settled on April 3, 2026.

49. In an amended Schedule 13D, which RBCH filed on April 7, 2026, Defendants reported beneficially owning 22,222,222 shares, representing 22.74% of the outstanding Class B Ordinary shares of Solmate.

50. Fischer resigned from the Board in April 2026.

51. On May 26, 2026, RBCH sought to compel shareholders to replace the Solmate Board and appoint Fischer, among others, as a director.

52. One of the new directors that RBCH sought to install was Jonathan Bates, who had previously served as a managing partner and advisor for Boustead Capital Partners (a related entity of McClory Group members BCL and BSL), and who had appeared on a podcast with McClory touting their past successful deals.

53. To achieve this coup, RBCH made a formal written request to the Company to hold a shareholder meeting to address a matter requiring shareholder approval pursuant to Section 178(3) of the Irish Companies Act 2014, a process called requisitioning an extraordinary general meeting.

54. In a publicly filed letter issued on May 28, 2026, the Solmate Board responded to the requisition notice, describing it as a "transparent and improper attempt to wrest control of the Company" following the termination of the RockawayX sale and Fischer's failed "attempt to create leverage against the Company for his own financial gain."

55. As stated in the Board's response:

> Understood in proper context, the Requisition Notice is a retaliatory attack on Solmate's Board for performing its fiduciary duties. It is clear to the Board that RBCH's objective is not long-term value creation. Instead, **RBCH and Mr. Fischer desire to control the Company's balance sheet and strategic direction without offering shareholders a premium or presenting a coherent long-term value creation plan**. Setting aside these substantive concerns, the Board also has gating questions regarding RBCH's compliance with its obligations under the Securities Exchange Act of 1934, particularly with respect to the number of shares that it reports as beneficially owned on its Schedule 13D.

(Emphasis added.)

56. Accordingly, the Board refused to convene the extraordinary general meeting.

**B. Solmate Adopts a Rights Agreement to Guard Against Hostile Takeovers.**

57. On April 24, 2026, before Defendants began their attempt to take over the company through shareholder activism, Solmate entered into the Rights Agreement that limits any shareholder's ability to amass enough shares to control the Company.

58. The Rights Agreement contains a "poison pill" provision—if any one shareholder or group of shareholders exceeds the threshold of 9.99% ownership of outstanding Class B ordinary shares without prior approval of the Board, they are deemed an "Acquiring Person." (Rights Agreement § 1(a)).

59. In that event, all other shareholders are automatically able to purchase shares in the Company at a 50% discount of their market value. However, the rights acquired or beneficially owned by an Acquiring Person "shall be null and void without any further action, and any holder of such Rights shall thereafter have no right to exercise such Rights under any provision of this Agreement or otherwise." (Rights Agreement § 11(a)(ii)). Accordingly, all shareholders other than the Acquiring Person are given the right to purchase discounted shares of Solmate.

60. In other words, this poison pill provision means that anyone who acquires more than 9.99% of Solmate's Class B ordinary shares would be automatically and significantly diluted on exercise of such rights.

61. Section 1(a)(3) of the Rights Agreement grandfathers in certain holders who had exceeded the threshold of Acquiring Person at the time the Rights Agreement was adopted, stating that "a Person [who] would otherwise be deemed an 'Acquiring Person' upon the execution of this Agreement, such Person (herein referred to as a 'Grandfathered Shareholder') shall not be deemed an 'Acquiring Person' for purposes of this Agreement[.]"

62. However, that Grandfathered Shareholder status is immediately forfeited if "such Grandfathered Shareholder acquires Beneficial Ownership of any additional Ordinary Shares of the Company (other than as a result of a stock dividend, stock split, or similar transaction effected by the Company in which all registered holders of the Ordinary Shares of the Company are treated substantially equally . . . ) after execution of this Agreement and while the Beneficial Owner of 9.99% . . . or more of the Ordinary Shares of the Company then outstanding."

63. Thus, in the event a Grandfathered Shareholder acquires even one more share of Solmate, "such Person shall no longer be deemed a Grandfathered Shareholder and shall be deemed an 'Acquiring Person'," triggering dilution.

64. Section 1(g) of the Rights Agreement defines when a Person is deemed the "Beneficial Owner" of securities. As relevant here, a person is deemed a Beneficial Owner of any shares:

i. "Which such Person or any of such Person's Affiliates or Associates beneficially owns, directly or indirectly;"
ii. "Which such Person . . . has the right or the obligation to acquire pursuant to any agreement, arrangement, or understanding . . . or upon the exercise of conversion rights, exchange rights, rights (other than these Rights), warrants or options, or otherwise . . . ."
iii. "Which are beneficially owned, directly or indirectly, by any other Person with which such Person or any of such Person's Affiliates or Associates has any agreement, arrangement, or understanding . . . for the purpose of acquiring, holding, voting . . . or disposing of any securities of the Company."

65. Section 1(t) defines "Person" to include "any group under Rule 13d-5(b)(1) of the Exchange Act."

66. For purposes of measuring a Person's ownership percentage, Section 1(g) provides that "then outstanding" means "the number of such securities then issued and outstanding together with the number of such securities not then actually issued and outstanding which are issuable by the Company and which such Person would be deemed to Beneficially Own hereunder."

67. "Ordinary Shares" means Solmate's Class B ordinary shares.

68. The Rights Agreement defines "Shares Acquisition Date" as "the first date of public announcement by the Company or an Acquiring Person that an Acquiring Person has become such," which expressly includes "a report filed or amended pursuant to Section 13(d) under the Exchange Act."

69. Accurate Schedule 13D disclosure of group membership is essential to the operation of the Rights Agreement. Without it, the Company, its Board, the rights agent, and its shareholders are under the mistaken impression that the Rights Agreement's "poison pill" provision and other consequences have not been triggered.

**C. Defendants Are Unable to Acquire More Shares Without Being Diluted.**

70. As a result of the Rights Agreement, Defendants are at the limit of the ownership threshold and cannot acquire a single additional share without causing the Company to issue new shares to all other shareholders who exercise their right under the Rights Agreement, which would dilute Defendants' voting power.

71. The RBCH Group jointly filed its initial Schedule 13D concerning Solmate on September 30, 2025, and filed amendments on December 4, 2025; February 9, 2026; April 7, 2026; May 28, 2026; June 24, 2026; and October 26, 2026.

72. The October 26, 2026 amendment included a signed certificate from each of the three Reporting Persons in the RBCH Group that "[a]fter reasonable inquiry and to the best of my knowledge and belief, . . . the information set forth in this statement is true, complete and correct."

73. In Amendment No. 3 to the RBCH Group's Schedule 13D, filed April 7, 2026, RBCH reported beneficial ownership of 22,222,222 Class B ordinary shares, consisting of 8,378,988 shares, pre-funded warrants for 2,732,123 shares, and common warrants for 11,111,111 shares, representing 22.74% of the class based on the number of then-outstanding shares.[3]

74. Because RBCH would have been an Acquiring Person upon the execution of the Rights Agreement on April 24, 2026, it became a Grandfathered Shareholder under Section 1(a)(3).

75. On May 21, 2026, Solmate entered into subscription agreements to sell 2,298,000 new Class B shares in a registered direct offering, which closed on May 27, 2026, increasing the outstanding Class B shares from around 8.66 million to around 11 million. As a result, the RBCH

---

[3] As described in the Company's Annual Report filed with the SEC on Form 20-F for the fiscal year ended December 31, 2025, excluding the warrants that RBCH held, RBCH's ownership of Class B Ordinary Shares is 9.99% of then-outstanding Class B Ordinary Shares.

Group's ownership percentage inclusive of both ordinary shares and warrants fell from 22.74% to 18.33%, providing additional motive to acquire voting influence.

76. In Amendment No. 6 to the RBCH Group's Schedule 13D, filed October 26, 2026, Defendants reported that RBCH held 1,111,111 Class B ordinary shares and common warrants to purchase 1,111,111 Class B ordinary shares, for aggregate beneficial ownership of 2,222,222 shares, or 18.33% of the class.

77. Therefore, since April 24, 2026, Defendants have been unable to acquire Beneficial Ownership of a single additional Class B ordinary share without becoming an Acquiring Person and triggering the Rights Agreement.

78. On July 27, 2026, the McClory Group filed a joint Schedule 13D (the "McClory Group Schedule 13D"). This is the only Schedule 13D that the McClory Group filed after the Rights Agreement was enacted.

79. In their joint Schedule 13D filed July 27, 2026, the members of the McClory Group reported aggregate beneficial ownership of 706,796 Class B Ordinary Shares. Measured against the 11,009,294 Class B ordinary shares outstanding as of June 30, 2026, the closest date of reported outstanding shares by the Company, the McClory Group beneficially owns approximately 6.42% of outstanding Class B ordinary shares.

80. Because the McClory Group was below 9.99% when the Rights Agreement was executed on April 24, 2026, it could acquire additional shares without triggering the "poison pill" provision.

**D. Defendants Use the McClory Group to Amass More Voting Power and Avoid Triggering the Poison Pill Provision.**

81. Unable to acquire additional voting power, Defendants joined forces with a like-minded shareholder group to amass more influence without risking dilution. The history of the

interactions between Defendants and members of the McClory Group, and the actions they have taken since the Rights Agreement was adopted, reveal their "arrangement, agreement, or understanding" for the purpose of voting Solmate securities together.

82. In particular, Fischer and McClory have a relevant history that informs the larger group dynamic.

83. McClory is the founder, chair, and CEO of BCL, a member of the McClory Group.

84. Fischer joined the Solmate Board of Director on September 23, 2025, when McClory served as its Executive Chairman.

85. McClory attended negotiation sessions for Fischer's failed RockawayX transaction. On or about October 16, 2025, McClory attended a meeting in London, where Fischer and Havrlant presented RockawayX's financial materials to Solmate. In October 2025, McClory and Fischer corresponded about scheduling operational and "affiliation" calls between Solmate and RockawayX. In December 2025, McClory and Fischer each signed the Board resolutions approving the RockawayX term sheet, under which Fischer would have become Solmate's Executive Chairman.

86. Both individuals left the Board in early 2026: McClory left in January 2026, and Fischer left in April 2026. After their departures, both began criticizing the Board publicly.

87. On May 26, 2026, RBCH requisitioned an extraordinary general meeting of the Company's shareholders to remove and replace the Board, reinstating Fischer as a director. As further evidence of Fischer's and McClory's agreement, RBCH proposed adding a close connection of McClory's to the Solmate Board: Jonathan Bates, who has worked with McClory and other affiliates of the McClory Group. The Board refused to call the meeting.

88. The Board held the company's annual general meeting on June 26, 2026.

89. Prior to that meeting, McClory and Fischer participated together in investor calls and meetings concerning the Company.

90. McClory and Fisher reached out to all PIPE investors through the Boustead entities of the McClory Group to discuss voting against the Board and urged shareholders to support a RockawayX acquisition, emphasizing that RockawayX has enough experience to run the Company.

91. At that June 26, 2026 annual general meeting, RBCH, McClory, and Pinehurst voted against each director nominee, as did a number of other holders, at least one of whom Fischer had been in contact with in the month preceding. Nevertheless, a majority of shareholders re-elected all of the Company's Board nominees.

92. During this period, BCL (a member of the McClory Group) and RBCH used the same counsel in their respective challenges to the Board. On April 17, 2026, Dublin solicitors Clerkin Lynch wrote to the Company on BCL's behalf contesting the conduct of an extraordinary general meeting held ten days prior. By June 2026, Clerkin Lynch was acting as RBCH's counsel in connection with their requisition of an extraordinary general meeting to remove and replace the Board. That the same law firm acted for both BCL and RBCH in pressing challenges to the same Board, within weeks of each other, indicates that the groups regarded their interests as aligned.

93. After the failed attempt to mount a shareholder vote against the Board, on June 22, 2026, RBCH filed a derivative lawsuit against five of Solmate's directors in the Supreme Court of New York, RBCH Ltd. v. Sade et al., Index no. 157850/2026 (Hon. Robert R. Reed), (the "New York Action"), attacking the Rights Agreement and seeking to enjoin the voting of shares issued to two directors in a registered direct offering.

94. Specifically, RBCH's derivative lawsuit purports to challenge "a strategic advisor agreement," an "advisory services agreement," "additional compensation" for one of the directors, and the poison pill provision in the Rights Agreement.

95. On July 27, 2026, five weeks after RBCH filed suit and four weeks after the annual general meeting, the McClory Group filed its Schedule 13D. That filing listed criticisms of the Board that aligned with those of RBCH in the New York Action. It also complained that the Rights Agreement prevented shareholders from "acting as a group without the blessing of the Board."

96. Specifically, the McClory Group stated that "Reporting Persons believe that the Issuer's current board of directors (the 'Board') and management team have presided over substantial destruction of shareholder value and engaged in highly concerning conduct, and that meaningful change in the Issuer's leadership is urgently needed."

97. Further, the McClory Group's Schedule 13D discusses the same strategic advisor agreement, advisory services agreement, registered direct offering and poison pill provision complained of in the New York Action.

98. Indeed, in that same filing, the McClory Group emphasizes RBCH's New York Action:

> The Reporting Persons also noted the complaint (the "Complaint") filed in the Supreme Court of the State of New York by RBCH Ltd. ("RBCH") on June 22, 2026, alleging breaches of duties by certain directors of the Issuer, among other claims, which Complaint is included as an attachment to RBCH's Schedule 13D filed with the Securities and Exchange Commission on June 24, 2026. The Reporting Persons are concerned about the allegations made in the Complaint, intend to monitor developments in this litigation closely and reserve all rights.

99. On July 31, 2026, counsel for Solmate asked the McClory Group to "state in writing whether any agreement, arrangement, understanding or coordinated course of conduct concerning the Company's securities, governance, Board composition or the pending litigation exists or has

existed" with Fischer, RBCH, Havrlant, RockawayX, or their affiliates, and noted that "[a] denial should be unqualified."

100. The McClory Group did not deny the existence of an arrangement with Defendants.

101. On August 21, 2026, counsel for Solmate again asked the McClory Group for an unqualified answer by August 26, 2026, stating that "[i]f the answer is no, your clients should be able to say so plainly." The McClory Group again did not offer such a denial.

102. The facts alleged above, particularly the parties' ties, their shared counsel, the timing and coordination of their conduct after April 24, 2026, the joint investor communications, their parallel votes against every director nominee at the June 26, 2026 annual general meeting, their shared objective of replacing the Board, the McClory Group's refusal to deny the arrangement, and Defendants' strong desire to obtain voting support without acquiring shares, illustrate that such an agreement or arrangement to vote Solmate securities exists.

103. Indeed, this is the very conduct that Sections 1(g)(ii)(C) and 1(g)(iii) of the Rights Agreement, and Section 13(d)(3) of the Exchange Act, were created to address.

104. None of Defendants' Schedule 13D filings discloses the agreement, arrangement or understanding of the Aggregate Group. Defendants' filings never mention BREA, McClory, or any of the McClory Group's members.

105. Defendants filed Amendment No. 6 to the RBCH Group's Schedule 13D on October 26, 2026, after the agreement, arrangement, or understanding with the McClory Group had been formed. Each Defendant signed Amendment No. 6 and certified that the information in it was "true, complete and correct." It was not.

106. Because Amendment No. 6 fails to disclose the RBCH Group's arrangement with the McClory Group, it is false, misleading, and incomplete in the following respects:

(a) It reports on its cover page that RBCH has sole voting power and sole dispositive power over 2,222,222 shares, shared voting power and shared dispositive power over none, and aggregate beneficial ownership of 2,222,222 shares, or 18.33% of the class. In reality, the combined Aggregate Group beneficially owns approximately 24.17% of the class as a result of the agreement, arrangement, or understanding for the Aggregate Group to vote Solmate securities together.

(b) Amendment No. 6 describes discussions about potential changes to the Board and management and the possibility of requisitioning a second extraordinary general meeting to replace them, as plans of "the Reporting Persons" alone. Those plans belong to the combined group, and attributing them to the RBCH Group alone hides the Aggregate Group's agreement.

(c) Item 6 of that filing, which requires disclosure of all contracts, arrangements, understandings, or relationships with respect to the issuer's securities, discloses only that RBCH exercised its pre-funded warrants. The Aggregate Group is the type of arrangement Item 6 requires to be disclosed; omitting it makes Item 6 incomplete.

(d) It expressly provides that it "does not modify or amend any of the information previously reported in the Schedule 13D." That statement reaffirms the earlier filings of RBCH, Fischer, and Havrlant as the only "Reporting Persons," which the undisclosed Aggregate Group proves is false.

107. By failing to satisfy the legally mandated disclosure requirements, Defendants have harmed the Company and its shareholders by depriving them of critical information about the full extent of the Aggregate Group, including the Aggregate Group's intentions, its size, and the volume of its holdings. Further, the undisclosed combination of the two groups ensured that Defendants would circumvent the Company's protective poison pill provision meant to dilute shareholders who amassed enough shares to take hostile action against the Company.

## CLAIM FOR RELIEF

### Violation of Section 13(d) of the Exchange Act and Rules 13d-1 and 13d-2 Based on False, Misleading, and Incomplete Schedule 13D

(Against All Defendants)

108. Solmate realleges and incorporates by reference each of the foregoing paragraphs as fully set forth herein.

109. Section 13(d)(1) of the Exchange Act, 15 U.S.C. § 78m(d)(1), and Rule 13d-1(a), 17 C.F.R. § 240.13d-1(a), require any person who is the beneficial owner of more than 5% of a class of equity securities to file with the SEC a Schedule 13D disclosing, among other things, their ownership interest in the company.

110. Under Section 13(d)(3) of the Exchange Act, 15 U.S.C. § 78m(d)(3), and its implementing regulations, a group that acts together to acquire more than 5% of a company's securities is required to disclose their combined ownership on Schedule 13D: "When two or more persons agree to act together for the purpose of acquiring, holding, voting, or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership, for purposes of section 13(d) and (g) of the Act, as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons." 17 C.F.R. § 240.13d-5(b)(1).

111. Rule 13d-2(a), 17 C.F.R. § 240.13d-2(a), requires that any material changes to the facts set forth in a Schedule 13D filing, including any increase or decrease in ownership, must be disclosed by filing an amendment. The formation of a group with another holder of more than 700,000 shares, increasing the aggregate beneficial ownership reportable by Defendants from approximately 18.33% to approximately 24.17%, and changing the identity of the persons with whom Defendants act with respect to the Company's securities, is a material change that requires an amendment.

112. Rule 12b-20, 17 C.F.R. § 240.12b-20, further requires that, "[i]n addition to the information expressly required to be included in a statement or report," filing persons must add "such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made, not misleading."

113. When an investor fails to comply with Section 13(d), the issuer of the shares has standing to bring an action to compel compliance. Here, as the issuer, Solmate has standing to bring an action against Defendants.

114. By reason of the foregoing, Defendants violated Section 13(d) of the Exchange Act and Rules 13d-1 and 13d-2 by failing to disclose its formation of a group with McClory, BREA, Pinehurst, BCL, BSL, Moore, Libanori, and Smith. Accordingly, Defendants filed a false, misleading, and incomplete Schedule 13D amendment on October 26, 2026.

115. The RBCH Schedule 13D, including Amendment No. 6, is false, misleading, and incomplete in at least the following respects:

(a) it fails to disclose that, within the meaning of Section 13(d)(3) and Rule 13d-5(b)(1), McClory, BREA, Pinehurst, BCL, BSL, Moore, Libanori, and Smith are members of an Aggregate Group with Defendants;

(b) it fails to disclose the date that the Aggregate Group was formed or expanded; and

(c) it fails to disclose necessary information to make the statements it does contain not misleading in violation of Rule 12b-20.

116. Defendants also failed to file a prompt amendment to the RBCH Schedule 13D when the Aggregate Group was formed or expanded after April 24, 2026, as Rule 13d-2(a) requires. Each amendment Defendants filed after the Aggregate Group was formed, including at least Amendment No. 6, filed on October 26, 2026, compounded that violation by repeating and falsely representing that Defendants acted alone.

117. The omitted information is significant. Any reasonable shareholder would consider it material that Defendants are acting in concert with another group. The omitted information also bears directly on the operation of the Rights Agreement.

118. Defendants knew, or disregarded, that the RBCH Schedule 13D was false, misleading, and incomplete. Fischer participated personally in communications with the McClory Group's leader. It was through these communications that the arrangement was formed and carried out.

119. Based on the above violations, Solmate and its shareholders have been, are now, and will be irreparably harmed absent the relief requested herein because Defendants' false Schedule 13D filings deprive them of the full and accurate information to which they are entitled. Specifically, Defendants' failure to disclose the Aggregate Group has impeded Solmate's ability to consider appropriate responses to the Aggregate Group's ongoing campaign to remove and replace the Board, including any second requisition of an extraordinary general meeting that Defendants have disclosed as a possibility. Defendants' failure to disclose likewise deprives Solmate, its Board,

and the rights agent of information necessary to the operation of the Rights Agreement. Finally, the existence of the Aggregate Group, and its combined beneficial ownership of approximately 24.17% of Solmate's Class B ordinary shares, is important factual information for Solmate's shareholders, who continue to trade Solmate shares and to evaluate Defendants' calls for changes to the Board and management without it. The ongoing inaccuracies in Defendants' Schedule 13D filings continue to harm Solmate and Solmate's shareholders.

120. Solmate has no adequate remedy at law and seeks injunctive relief to cure existing violations of Section 13(d) and to prevent irreparable injury arising from such violations.

## PRAYER FOR RELIEF

WHEREFORE, Solmate respectfully requests that the Court enter judgment against Defendants, and issue the following relief:

(a) Declaring that Defendants and the McClory Group have formed a single group under Section 13(d)(3) of the Exchange Act;

(b) Declaring that Defendants violated Section 13(d) of the Exchange Act, 15 U.S.C. § 78m(d), through their actions as alleged and described above;

(c) Ordering Defendants to file a complete and accurate Schedule 13D, as set forth herein;

(d) Enjoining Defendants from entering into, continuing, or acting in furtherance of any agreement or arrangement with any member of the McClory Group, or any other person, regarding the acquisition, holding, voting, or disposition of Solmate securities, unless and until that agreement

or arrangement has been completely and accurately disclosed in an amendment to the RBCH Schedule 13D;

(e) Awarding Solmate its attorneys' fees and costs as provided by law; and

(f) Awarding all such further relief as the Court deems appropriate.

DATED: November 24, 2026

PAUL HASTINGS LLP

By: *John D. Buretta*

John D. Buretta
Samuel Kleiner
Megan Y. Lew
Kathryn M. Baldwin
200 Park Avenue
New York, New York 10166
(212) 318-6000
johnburetta@paulhastings.com
samkleiner@paulhastings.com
meganlew@paulhastings.com
katybaldwin@paulhastings.com

Ronald K. Anguas, Jr.
2050 M Street NW
Washington, DC 20036
(202) 551-1700
ronaldanguas@paulhastings.com

*Attorneys for Plaintiff Solmate Infrastructure PLC*